618 A.2d 1062

DEPARTMENT OF ENVIRONMENTAL RESOURCES, Petitioner,

v.

Kenneth A. BARTAL, James R. Benson, Theodore P. Clista, John W. Havens, Thomas J. Sabatino, John F. Slade, and John J. Wroblewski, Respondents.

Kenneth A. BARTAL, James R. Benson, Theodore P. Clista, John W. Havens, Thomas J. Sabatino, John F. Slade, and John J. Wroblewski, Petitioners,

v.

DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.

Commonwealth Court of Pennsylvania.

Argued Sept. 14, 1992.

Decided Nov. 25, 1992.

604

Patrick H. Bair, Asst. Counsel, for petitioner/respondent, Dept. of Environmental Resources.

J. Jay Cooper, for respondents/petitioners Kenneth A. Bartel et al.

Before McGINLEY and PELLEGRINI, JJ., and NARICK, Senior Judge.

McGINLEY, Judge.

■ The Department of Environmental Resources (DER) petitions for review of orders of the State Civil Service Commission (Commission) that sustained the appeals of Kenneth A. Bartal and six other DER employees in their challenges, based on claims of discrimination, to DER's reclassifi-

cation of their positions downward.[1] Before June 29, 1989, the employees were classified as Sanitary Engineer (SE) 5, Air Pollution Control Engineer (APCE) 5 or Sanitarian Program Manager (SPM). Effective June 30, 1989, they were reclassified downward to SE 4, APCE 4 or Sanitarian Program Specialist Supervisor (SPSS). The scope of our review of a decision of the Commission is limited to determining whether there was a constitutional violation or an error of law and whether the necessary findings of fact are supported by substantial evidence in the record. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *McGuire v. Department of Aging*, 140 Pa.Commonwealth Ct. 378, 592 A.2d 830 (1991).

In April of 1988, as the result of the negotiation of new union contracts, the Commonwealth decided to reduce the total number of classification titles state wide and to institute a new pay structure whereby the former more than thirty pay ranges were reduced to fourteen pay groups. Adjudication of the State Civil Service Commission of September 25, 1991 (Commission Decision[2]), Finding of Fact (F.F.) No. 3; R.R. 1106a.[3] The changes were to become effective July 1, 1989. On June 14, 1988, the Deputy Secretary for Employe Relations of the Office of Administration of the Commonwealth (OA), Charles T. Sciotto (Sciotto), distributed to personnel directors of all agencies under the jurisdiction of the Governor

1. The petitions for review have been consolidated at No. 2264 C.D. 1991. Bartal and the other employees petition for review of the Commission's denial of their applications for an award of reasonable attorney's fees and expenses relating to these proceedings pursuant to the Act of December 13, 1982, P.L. 1127, *as amended*, 71 P.S. §§ 2031–2035, commonly known as the "Costs Act." Those petitions are consolidated at No. 2724 C.D. 1991.

2. The Commission issued identical Adjudications for all appealing employees. We shall cite to that for Kenneth A. Bartal, Appeal No. 8577; Reproduced Record (R.R.) 1106a.

3. Because Pay Group 1 is reserved for special classes and Pay Group 14 is used only for two positions in the Department of Welfare, there were effectively twelve pay groups available to DER. Notes of Testimony (N.T.) April 19, 1991, 429; R.R. 457a. The increase in salary from one pay group to the next under the new structure is 15%; the increase from one pay range to the next formerly was 4–5%. N.T. April 15, 1991, 243–44; R.R. 269a–70a.

a list of all existing classifications and pay ranges, along with a new designation of each classification in a proposed pay group. OA requested that each agency review the list and comment and identify no-longer-needed classifications for abolishment. Appellants' Exhibit (AP–) 18; R.R. 703a. The list slotted SE 6 and APCE 6 (existing Pay Range 50) in the new Pay Group 11; SE 5 and APCE 5 (existing Pay Range 48) and SPM (existing Pay Range 47) in Pay Group 10; and SE 4 and APCE 4 (existing Pay Range 45) and SPSS (existing Pay Range 44) in Pay Group 9. F.F. No. 4; AP–18; R.R. 726a, 759a.

Some classification titles appear only within a single agency, and some are used in more than one. Classification titles do not necessarily correlate with organizational structure titles; however, under the previous system SE 4 and APCE 4 were "Unit Chiefs", SE 5 and SE 5 were "Section Chiefs", and SE 6 and APCE 6 were "Division Chiefs" within DER. The next higher organizational level is the Bureau Director. Some Bureau Directors in DER were placed in Pay Group 12 and some were in Pay Group 11.[4]

By memorandum of June 20, 1988, DER's Deputy Secretary for Administration, Gregg Robertson (Robertson), responded to the OA list with a variety of proposed changes, including a recommendation that the Director of the Bureau of Air Quality Control be placed in Pay Group 11 rather than 12, because the responsibilities did not merit the higher level, and that SE 6, APCE 6 and Chief of the Division of Water Quality be placed in Pay Group 10 rather than 11. F.F. No. 6; AP–19; R.R. 793a. That memorandum made no reference to OA's recommendations as to SE 5, APCE 5 or SPM. In a confidential memorandum from Robertson to Deputy Secretaries of

---

4. Mike Neumyer, Chief of the Classification and Staffing Division of the Bureau of Personnel of DER, who was primarily responsible for formulating DER's responses to OA, testified that OA had instructed DER that from a top down and bottom up point of view, Bureau Directors would be in both Pay Groups 11 and 12. "We have Bureau Directors that have 8 people working for them. We have Bureau Directors with 650 people working for them. And OA was not going to allow us to put all our Bureau Directors in pay range 12." N.T. April 19, 1991, 316; R.R. 343a.

DER of January 21, 1989, Robertson noted OA's effort to reduce the number of classes by 30% in the current fiscal year and informed them of many changes, including consolidation of SE 5 and 6 and APCE 5 and 6 in Pay Group 10. F.F. No. 9; AP–21; R.R. 801a.

Sciotto sent a revised proposal to the agencies on February 22, 1989, to be considered final unless changes were recommended by March 15, 1989. That listing included SE 5 and 6 and APCE 5 and 6 at Pay Group 10. F.F. 10; AP–25; R.R. 811a. Robertson responded with a memorandum concerning various eliminations or consolidations recommended by DER, but also noting DER's "particular concern" that SE 5 and 6 and APCE 5 and 6 be maintained as separate classes within Pay Group 10. F.F. 11; AP–26; R.R. 875a. Sciotto responded in a memorandum of March 29, 1989, which stated:

> Since classes at the 'division chief' level in other engineering disciplines in DER, General Services and Transportation, that are comparable to these classes in accountability, problem solving and technical know-how have been placed in Pay Group 10, we do not believe that the 5 (section chief) and 6 (division chief) levels of the [SE] and the [APCE] should remain in separate classes within the respective discipline in the same pay group. It is not logical to have a position at the section chief level be in the same pay group as the division chief level to which it reports. [DER] should address the work that is appropriate at pay group 10 in one standard for both sanitary engineering and air pollution control engineering. If there is work that does not merit placement in pay group 10, the 4 level class in these series is appropriate to describe 'section chief work', at pay group 9.

F.F. Nos. 12–13; AP–27; R.R. 879a.

A "Problem" memorandum prepared by DER staff noted that the SE and APCE class series contained six levels—one more than other engineering disciplines. With the entry level starting at Pay Group 6 and Division Chiefs at Pay Group 10, DER had only five pay groups in which to slot six existing classes. The memorandum stated that OA had instructed

DER to slot Division Chiefs at 10 and Section Chiefs at 9. For DER's Central Office Bureaus, in Harrisburg, the memorandum recommended consolidating SE 6 and APCE 6 in a new class in Pay Group 10; eliminating SE 5 and APCE 5; using SE 4 and APCE 4 as Section Chiefs at Pay Group 9 (and reclassifying many of the incumbents); and using SE 3 and APCE 3 as first level supervisor, unit chief or advanced technician. For Field Offices, the memorandum recommended reclassifying regional APCE 5s to a new class in Pay Group 10 and noted that two positions currently classified SPM in Pay Group 10 were actually Section Chiefs and would need to be reclassified to an appropriate Section Chief classification. AP–35; R.R. 1079a.

By memorandum of June 30, 1989, Robertson informed Mark M. McClellan (McClellan), the Deputy Secretary for Environmental Protection of DER, of the reclassifications of thirteen individuals, including all of those involved in the present case. In meetings and in internal DER correspondence, McClellan had opposed the designation of some Bureau Directors in Pay Group 11 rather 12, and the reclassifying of some SE 5s and APCE 5s as 4s. N.T. April 19, 1991, 269–73; R.R. 296a–300a. Robertson's memorandum to McClellan stated:

> These adjustments have been made as part of the implementation of the Commonwealth's new pay system, which is effective July 1. The classification consolidation for Sanitary Engineers and Air Pollution Control Engineers, and the decision that section chiefs will be in a lower pay group than division chiefs, are the specific reasons for these changes.

F.F. No. 15; AP–33; R.R. 893a.

DER reclassified the employees effective June 30, 1989. The Executive Board of the Commonwealth reviewed and adopted the final OA proposals for assignment of classifications to new pay groups in Executive Board Amendment 541, effective July 1, 1989. F.F. No. 16; AP–34; R.R. 895a.[5]

---

5. The Executive Board is comprised of the Governor and six other heads of administrative departments. It is the body that has the power

Each employee involved here received notice of the reclassification in late July of 1989.[6]

The affected employees filed appeals with the Commission alleging under Section 951(a) of the Civil Service Act (Act)[7] that the actions were improper demotions and, under Section 951(b), that they were discriminatory. The Commission refused to grant a hearing under Section 951(a) of the Act and denied those appeals, but it granted a hearing on the claims of discrimination under Section 951(b). Hearings were held on August 7, 1990, April 15, 1991, and April 19, 1991.[8] The Commission issued adjudications that concluded that DER had discriminated against the employees, relying primarily on this court's decision in *Balas v. Department of Public Welfare,* 128 Pa.Commonwealth Ct. 205, 563 A.2d 219 (1989) (*Balas I* ).

In *Balas I* a group of Department of Public Welfare (DPW) employees asserted that DPW had reclassified both them and another group of employees, who previously did the same work but with a different classification at a lower pay range, into a new classification at the lower pay range solely for the

"[t]o standardize the qualifications for employment, and all titles, salaries, and wages, of persons employed by the administrative departments, boards and commissions .... In establishing such standards, the board may ... establish different standards for different kinds, grades and classes of similar work or service." Section 709(a) of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, *as amended,* 71 P.S. § 249(a).

6. We take note that petitioner Thomas J. Sabatino, had his position reclassified upward from SPSS to SPM roughly a year and a half earlier, after he requested a review of his duties.

7. Act of August 5, 1941, P.L. 752, *as amended,* added by Section 27 of the Act of August 27, 1963, P.L. 1257, 71 P.S. § 741.951(a). In a Section 951(a) hearing the appointing authority has the burden of proving proper reasons for separation, suspension for cause, furlough or demotion. Under Section 951(b) the employee has the burden of proving a violation of Section 905.1 of the Act, added by Section 25 of the Act of August 27, 1963, 71 P.S. § 741.905a, which prohibits discrimination in any personnel action in the classified service on the basis of political or religious opinions or affiliations or labor union affiliations "or because of race, national origin or other non-merit factors."

8. In addition to the transcripts of the hearings and the exhibits, the record includes extensive stipulations by the parties regarding the details of each employee's reclassification and the exhibits that the employees introduced.

purpose of eliminating the pay discrepancy and stifling any increases in complaints from the lower paid group. Always implicit in the appealing employees' contentions was the claim that their jobs were correctly classified before, and DPW's *motive* for the change was unrelated to any proper classification consideration. The DPW employees also had appealed under Section 951(a) and (b) of the Act. They contended that the actions amounted to improper demotions and were discriminatory because they were not based on merit-related factors. The Commission denied them a hearing and dismissed the appeals, concluding that they had failed to state a claim under either provision. On appeal this court agreed that the reclassifications downward were not "demotions" subject to appeal under Section 951(a). However, we concluded that the employees' allegations surrounding the motive for their reclassification made out a claim of discrimination sufficient to entitle them to a hearing under Section 951(b), and we remanded.

In the present case, the Commission interpreted *Balas I* as holding that the allegations involving reclassification downward to eliminate a pay differential would, if proved, constitute discrimination. The Commission stated that the allegations in the present controversy involved reclassification to create a pay differential, and, "In our opinion, the problem is generically the same." Commission Decision at 13; R.R. 1117a. The Commission further reasoned:

Based upon the Court's discussion in Balas and the facts in the instant case, we conclude that the reclassification of the appellant's position was totally unrelated to competency or ability. The appellant has demonstrated that the purpose for the reclassification of his position was to create a pay differential between him, as a Section Chief, and his immediate supervisor, the Division Chief. In addition, the appellant demonstrated that there were no changes in his position duties or responsibilities after the reclassification. The evidence has also demonstrated that the appointing authority's actions were arbitrary and improper in that although it was determined by OA that the appellant should

not remain in the same pay group as his supervisor, he was immediately put into the same pay group as the person whom he (the appellant) was supervising. Insofar as the proposed pay plan retained the internal contradiction of supervisors being in the same pay range as their subordinates, directly contradicting OA's policy, the adoption of a plan which separates the appellants from their supervisors, but combines them with their supervisees is discriminatory treatment unrelated to either competency or ability.

*Id.* at 13–14; R.R. 1117a–18a. The Commission concluded that each appellant presented evidence establishing discrimination in violation of Section 905.1 of the Act and ordered the employees returned to their original classifications and therefore to Pay Group 10.[9]

█ On appeal, DER first contends that the Commission ignored competent evidence that a desire to create or to maintain a pay difference between supervisors and supervised is a proper classification consideration and also ignored extensive evidence that other proper factors were well considered. In response, the employees argue that DER is asking the court to reweigh the evidence, in violation of our substantial evidence standard of review of factual findings. Although framed in terms of sufficiency of evidence, DER's claim regarding the pay difference consideration raises a question of law. Whether an appointing authority actually considered a particular factor is a question of fact; however, the Commission's determination as to the *propriety* of such consideration is a conclusion of law.

This court recently revisited this area in *Balas v. Department of Public Welfare*, 151 Pa.Commonwealth Ct. 53, 616

9. In a dissenting opinion Chairman Ethel S. Barnett stated that credible evidence demonstrated that pay relationships between supervisory and subordinate positions are an appropriate factor to consider when positions are being classified and that DER considered additional factors as well in making the determinations. She concluded that the reclassifications did not result from discrimination but were a consequence of the reduction in classifications initiated by OA in order to fit within the new compensation schedule. Absent evidence of discrimination, Chairman Barnett noted, the Commission lacks jurisdiction over classification issues.

A.2d 143 (1992) (*Balas II* ). After the remand hearing ordered in *Balas I* the Commission found that the reclassification there was done solely as a means to classify the affected employees correctly and not as a means to equalize the pay difference between the two groups. The Commission denied the appeals. On appeal the employees continued to argue that their reclassifications were personnel actions improperly based on non-merit factors.[10] We noted, however, that the concept of reclassification based on factors other than individual job performance—i.e., other than merit—is firmly established, citing *McHale v. Department of Transportation,* 520 Pa. 282, 287, 553 A.2d 956, 958 (1989).

In *McHale* an employee's position had been reclassified downward after the Department of Transportation (DOT) conducted a classification and organizational survey and determined that his current classification was inappropriate for his responsibilities. He claimed an improper demotion in a Section 951(a) appeal. The Supreme Court quoted Section 706 of the Act, 71 P.S. § 741.706, relating to demotions, which provides that an appointing authority may demote to a vacant position at a lower class any employee who does not satisfactorily perform the duties of his current position, with rights of appeal under Section 951(a). The court stated, "The *impetus* for the change of position is critical, therefore, in determining whether a demotion has occurred which will trigger the right to appeal." *McHale,* 520 Pa. at 286, 553 A.2d at 958 (emphasis added). Where the change is not based on unsatisfactory performance, but rather results from the revamping of positions following a departmental review that discloses that current classifications are incorrect, the reassignment to a position in a different class is not a demotion triggering rights under Section 951(a). *McHale* holds, then, that a reassign-

---

**10.** The employees cited *Corder v. State Civil Service Commission,* 2 Pa.Commonwealth Ct. 462, 467, 279 A.2d 368, 371 (1971):

This means that any 'personnel action' carried out by the Commonwealth is to be scrutinized in the light of such merit criteria, as has the party failed to properly execute his duties, or has he done an act which hampers or frustrates the execution of same. The criteria must be job-related an in some rational and logical manner touch upon competency and ability.

ment based on the merit-related concern of poor performance is *not* a reclassification downward but rather a demotion.[11]

In *Balas II* the Commission heard evidence both from unaffected and affected employees and from the officials responsible for the reclassification. The Commission found that DPW had acted with a proper intent, that is, that its action was based solely on proper classification considerations. This court affirmed on the basis that the record contained substantial evidence to support that finding. We emphasized, however, that the Commission did *not* find or conclude that the employees' new classification was "correct." The Commission lacks jurisdiction to make such a determination, which is the exclusive province of the Executive Board. See n. 5, above.

In *Gorton v. State Civil Service Commission*, 35 Pa.Commonwealth Ct. 319, 385 A.2d 1026 (1978), this court noted that prior to 1963 Section 203 of the Act, 71 P.S. § 741.203, contained a provision requiring the Commission "to approve, modify or reject such classification plans for the classified service of the Commonwealth ...." However, the amendatory Act of August 27, 1963, P.L. 1257, deleted that provision and added Section 707, 71 P.S. § 741.707, which provides, "The classification of positions and the compensation of employes in the classified service shall conform to standards and rules adopted by the Executive Board." This court held that the 1963 amendments "unquestionably disclose a legislative

---

11. Despite the general language of *Corder* and other cases, some personnel actions are not based on merit-related factors. Furlough, for instance, may be based only on a lack of work or lack of funds. Section 3(t) of the Act, 71 P.S. § 741.3(t); 4 Pa.Code § 91.3. Although the designation of a furlough unit or the choice of furloughees from those in a particular unit may not be based on non-merit factors, the decision to furlough is based on purely economic factors. Similarly, classification or reclassification, which looks to the position itself rather than to the incumbent, must be based on proper *classification* factors rather than on merit-related job performance factors. *See* former 4 Pa.Code § 28.3, 5 Pa.B. 3082 (November 29, 1975): "Consideration of the general duties, specific tasks, responsibilities, requirements, and the relationship to other classes shall indicate the class of employment in which a position shall be included." Because all other classifications are presumed to have been established on the basis of proper classification factors, any reclassification based on other considerations is discriminatory.

intent to remove from the authority of the Commission classification of job positions and related compensation and to place this authority in the Executive Board." *Gorton,* 35 Pa.Commonwealth Ct. at 328, 385 A.2d at 1031.[12]

Thus the inquiry for the Commission in a challenge to a reclassification is whether the action was taken on the basis of factors that are proper classification considerations. A reclassification based on other considerations, such as race, sex, affiliation, or, as alleged in *Balas,* a desire to eliminate a pay discrepancy without regard to the proper classification of the affected positions, is discriminatory and is subject to Commission review and remedy on that basis.[13] However,

12. The substantive power of the Executive Board over reclassifications formerly was described in detail in the "Personnel Rules" of the Executive Board in 4 Pa.Code Chapters 23 through 38, which since have been reserved, except for provisions relating to leave without pay. The 1981 version of those rules defined "reclassification" as "[t]he reassignment of a position from one class to a different class to recognize a change in duties or responsibilities or to correct an error in the original assignment." Former 4 Pa.Code § 23.2. The "Personnel Rules" of the Commission formerly provided, in 4 Pa.Code § 99.42, that when a position is classified to a class with a lower maximum rate of pay due to change in the duties and responsibilities of the position as a result of action such as redistribution of duties, modification of responsibility or general program reorganization, the regular or probationary incumbent of the position should be reassigned if possible, and the incumbent had all rights to appeal provided in the Act, except that an appeal to the Commission from the technical classification decision would not be accepted. Section 99.42 provided a *procedure* affording the incumbent the protection of a search for an equivalent position in the event of a downward reclassification based on a change in duties. It did not confer substantive power over reclassification decisions on the Commission—that power remained with the Executive Board under statutes and other regulations.

13. DER also argues that a reclassification downward is not a "personnel action" subject to appeal under Section 951 of the Act. Although DER is correct that not every action by an appointing authority is a "personnel action" giving rise to a right to appeal, the courts consistently have recognized reclassification downward as an action that may be appealed under Section 951(b) based on a claim of discrimination. *See, e.g., Balas I, Johnson v. Department of General Services,* 91 Pa.Commonwealth Ct. 96, 496 A.2d 1268 (1985), and *Carr v. Department of Public Welfare,* 72 Pa.Commonwealth Ct. 78, 456 A.2d 240 (1983). More recently, reclassification downward has been added as Subsection (15) to the list of "personnel actions" provided in 4 Pa.Code § 105.2, for which written notice is required. 21 Pa.B. 5334 (November 15,

once the Commission determines that an action was based on legitimate classification considerations, it may not inquire into the correctness or wisdom of the reclassification decision.[14]

In the present case, the Commission's stated reasons for sustaining the employees' appeals all concern the wisdom of the classification decision itself. The Commission incorrectly concludes that DER's desire to create a pay difference between supervisors and supervised is generically the same as the allegations of a desire to eliminate a pay difference in *Balas I.* The difference is that the appealing employees in *Balas I* alleged that both groups did the same work and that their reclassification downward was done solely for the non-classification reason of eliminating the protests of the group at the lower level. Here, the Commission found that the motive was to preserve a pay difference between the supervisors and

1991). We have held Section 105.2 to be a nonexclusive list of actions that may give rise to an appeal under Section 951(b) of the Act. *Department of General Services v. Johnson,* 45 Pa.Commonwealth Ct. 245, 405 A.2d 596 (1979).

In *Office of Administration v. Orage,* 511 Pa. 528, 515 A.2d 852 (1986), the Supreme Court held that an employee has no property interest in the theoretically "correct" classification of his or her position at any particular moment, because there is no per se right to government employment, and there is no mechanism provided for an employee to enforce the requirement that classifications conform to the standards of the Executive Board. However, no claim of *discrimination* was involved in *Orage.* Section 99.42 of the Commission's "Personnel Rules" was in effect at that time, and, as noted above, it expressly provided for "all rights of appeal as provided in the act" from a reclassification downward, i.e., a right to challenge the action under Section 951(b) of the Act based on a claim of discrimination. Although reclassification looks to the nature of the position rather than to the merit-related factor of an individual's performance in that position, the reclassification action is serious, and with lasting effect. The incumbent has an interest enforceable under Section 951(b) that the position not be reclassified downward for reasons of racial or sexual discrimination or for any other reason that is not a proper classification consideration.

14. In *Balas II* the employees argued forcefully in the alternative that even if DPW proved its allegations of a change in their job duties some thirteen years earlier, reclassification under 4 Pa.Code § 99.42 was improper, because changes must be contemporaneous. We noted, however, that even if their interpretation of the regulation were correct, it constituted a challenge to the technical classification decision itself, which the Commission lacked authority to adjudicate.

those supervised—a motive that is unquestionably one among many proper classification considerations.

The Commission asserts that the actions were arbitrary. Such a contention, if proved, would form the basis for a charge of discrimination, because the action would not be based on a proper classification rationale. The employees advance a related claim that the actions were separate and distinct from the action of the Executive Board in issuing Amendment 541. However, that claim is inconsistent with the Commission's central finding that the actions were taken for the purpose of creating a pay differential, which necessarily acknowledges that the reclassifications were done principally to accommodate the new pay plan. The evidence and the Commission's findings show that the actions were taken in the context of a complete overhaul of the entire state classification system and that the particular actions appealed from were the subject of a great deal of discussion and comment both within and between OA and DER. The actions may or may not have been "correct" or the best possible solution to the problem confronting DER, but they certainly were not arbitrary.

The Commission concludes that the actions were improper because the result placed some supervisors and supervised together in the same class, contrary to DER's stated policy of keeping them separate. In this statement the Commission most clearly demonstrates its examination of the correctness of the reclassification decision itself. As the "Problem" memorandum noted above points out, DER had only five pay groups to accommodate six levels of engineering disciplines or classes. Chairman Barnett's dissent notes that Dennis Farley, the Director of DER's Bureau of Personnel, testified:

> The engineer series was a concern from basically day one with the new pay plan, because there were fewer than half as many ranges and there were too many levels of classification to fit within a new pay system. And that meant that a level was going to get squeezed out somewhere . . . .

N.T. April 15, 1991, at 223; R.R. 249a. Given this state of affairs, DER had no choice but to place two classifications together in one of the new pay groups.

■ We must conclude that the Commission erred by deciding that DER improperly combined classifications at the pay group level that it did. The Commission incorrectly faults DER's technical classification decision. Further, the Commission's relief orders the combining of classifications in a different pay group—violating the rationale that it claims to be serving. Chairman Barnett's dissent notes Farley's testimony that the issue of equity in pay relationships between supervisors and supervised "is one of the fundamental tenets of a classification system." *Id.* at 225; R.R. 251a. We believe that proposition is self-evident. DER was compelled to make a thorny choice. In the absence of proof of consideration of some non-classification-related factor, that choice is not subject to second-guessing, as a matter of law. *Gorton*.[15]

In view of our determination of the first issue, we need not address the other arguments advanced by DER. We must reverse the Commission Decision and reinstate the reclassifications of the employees. In view of our holding in No. 2264 C.D.1991, the employees' claims in No. 2724 C.D. 1991 to entitlement to attorney's fees under the Costs Act are moot.

## ORDER

AND NOW, November 25, 1992, the order of the State Civil Service Commission at Appeal No. 8577, dated September 25, 1991, is reversed. The petitions for review consolidated at No. 2724 C.D. 1991 are dismissed as moot.

■

**15.** The employees stress the stipulations of DER that no desk audits of their positions were performed before the reclassifications and that their duties in no way changed as a result of them. Several of the cases cited above involved reclassifications without any change in duties. *See, e.g., Balas II.* The argument concerning desk audits relates to the employees' erroneous perception that a reclassification should be merit-related. Although the employees disputed DER's determination that the duties of SE 5s and APCE 5s in Field Offices were sufficiently different from those of their counterparts in the Central Office Bureaus to merit different treatment, there is no claim in this case that DER was factually mistaken as to the duties of each of the positions in its hierarchy at the time of the reclassifications.